ROGERS v. UNION INDEMNITY CO.

No. 1109.

Court of Appeal of Louisiana. First Circuit.

March 7, 1933.

Fern M. Wood, of Leesville, for appellant.

C. V. Pattison, of Lake Charles, for appellee.

MOUTON, Judge.

Plaintiff, alleging that he was injured while performing services as an employee of the Couch Construction Company, brings this suit for compensation against the Union Indemnity Company, which, it is admitted, carried compensation insurance for the Couch Construction Company.

The demand was rejected. Plaintiff appeals.

It is averred by plaintiff, that on October 29, 1931, while in the service of the Couch Construction Company as one of its employees and assisting in the carrying of a heavy log, on the approach of a highway, he slipped, straining himself, which produced a hernia.

The Couch Construction Company and the Union Indemnity Company admit that plaintiff was in the employ of the Couch Construction Company on the date of his alleged injury, but specially deny that plaintiff suffered an injury or sustained a hernia while in the service of said company; and, in the alternative, plead that, should the court find that plaintiff has a hernia, at this time, they aver that he has had this hernia for years and long prior to his employment by the Couch Construction Company.

The vital issue presented for decision is as to whether the hernia occurred at the time alleged by plaintiff or had existed at a time prior thereto, as contended for by defendant.

In describing how the accident happened, plaintiff testifies that, with his fellow workmen, he was packing a log on the dump, which, he alleges, was "more than four men ought to carry," evidently the number of men who were engaged in the task. In going up the dump, he says, "one of our feet slipped; and a pain hit me." The pain was so intense, he says, "he had to lay down."

As it is shown that hernia may be caused by straining, the injury plaintiff alleges he

suffered could evidently have been the result of a slip while assisting the others in carrying the log up the dump.

It appears from the evidence of several witnesses 'for plaintiff and defendant that, immediately after dumping the log, plaintiff complained of being hurt, some saying he looked pale, and was apparently suffering, while others testified he had not so appeared to them.

Burges, who was doing construction work with plaintiff at that time, says plaintiff was pale; that he was sick; was hurt; and showed him a knot the size of an egg.

Russel, bookkeeper of the Couch Construction Company, says that about an hour after plaintiff was hurt, he reported to him, claiming that he was injured, and that he sent him to Dr. Douglas, physician of that company. He rode in a truck to the office of Dr. Douglas, who examined him the same evening shortly after he made his report to the bookkeeper, Russel, and found that plaintiff was suffering with a hernia.

It is therefore well established from the testimony of the witnesses, above referred to, that plaintiff was suffering with a hernia at the time he complained to several witnesses that he had been hurt and exhibited the evidence of it to one of them. As the proof shows that plaintiff had a hernia when he so complained, the sole question presented for a proper solution of this case is as to whether it originated at that time from the cause alleged, or was the plaintiff previously afflicted with it for years before, as defendant contends.

As this issue constitutes the pivotal question in this contest, several physicians were examined as medical experts to determine if upon examination of a patient, whether a hernia was of long standing, old, or of recent origin.

Drs. Word and Roberts were offered as experts on this issue by plaintiff; on the part of defendant, Drs. Holcombe, Douglas, Frazar, and Love.

Plaintiff alleges he was injured October 29, 1931, and was examined by Dr. Holcombe December 9, 1931, about five weeks after the accident. His testimony, as an expert, is that, according to the hernia plaintiff had at the time of his examination, it would be hard to give an answer as to the age of the hernia, but that it had existed possibly for several years. After a lengthy cross-examination, he finally concludes by saying, in his opinion, it was two, three, five, eight, or ten years at the time of his examination.

His testimony is that a physician can say after examination whether a hernia is old or recent.

Dr. Love was likewise of the opinion that an expert could say that a hernia was old or fresh. He examined plaintiff, said the hernia was old, but could not estimate the age.

Dr. Douglas, the company's physician, who was the first expert to examine plaintiff, says his idea was that the hernia was not of recent origin. He admits, however, on cross-examination, that the physicians disagreed about being able to say whether a hernia is old or recent. In connection therewith, he stated that by an operation it could be invariably determined whether it was old or new.

Dr. Frazar, expert for defendant, examined plaintiff on two occasions. His testimony is that on the first examination he had reached no decision as to whether the hernia was old or recent, and, that, when he examined him the second time, he came to the opinion that it was "an old hernia." He testified to the fact that it was "hard to determine" if the hernia was new or old.

Dr. Word, expert for plaintiff, testified that he had lately examined plaintiff, could not say if his hernia was old or new, and that an opinion in reference to the age of a hernia would be guesswork.

Dr. Roberts, plaintiff's expert, says it is a "divided opinion" as to whether a physician can know whether a hernia is old or of recent origin, as "no man can absolutely say the age of one." Dr. Roberts stated also that a physician could not tell if the hernia was recent or old "without an operation," and even if the patient submitted himself to an examination two or three hours after the injury.

Dr. Douglas, defendant's expert, it will be observed, said the age of the hernia could be invariably determined by an operation; and, in that respect, it may be stated that he agrees with Dr. Roberts, who also said that without an operation its age could not be determined.

All the physicians to whom we have hereinabove referred have had long experience in the treatment of hernias, as the record shows.

Many courts, in their decisions, take occasion to refer to the bias of experts inclining them to support the cause in which they are called to testify; some courts going to the extent of saying: "It is a human tendency and is the weakness of all expert testimony." Moore on Facts, vol. 2, § 1237.

We shall not consider the expert testimony in this case in that light. We are of the opinion that the medical experts in this case, and without exception, have testified to the best of their knowledge and ability.

Proceeding to the analysis of the testimony of these experts, according to the foregoing statements, what do we find?

We find that two of defendant's medical experts were of the opinion that the age of a hernia could be determined; the two others

for defendant saying that it was a doubtful proposition; and, from the two physicians offered by plaintiff, we have the opinion that no such determination could be made. The result is that two experts for plaintiff and two for defendant have pronounced opposite views on the question, while the two other experts, out of the six, have serious doubts on this controverted issue, either one way or the other.

■ The opinion of experts is not always binding on the court, particularly when at variance with positive testimony based on facts; and, when conflicting opinions exist between the experts, as appears in the instant case, the court is compelled to consult the other evidence in the record for a proper solution of the issue submitted for decision.

■ Rogers, plaintiff, testifies that he never had a hernia at any time prior to his alleged injury on October 29, 1931. He testifies that in the early part of the year 1929 he went to work for the Grand White Lumber Company and was examined by Dr. Conicker, and that he had no hernia. Thereafter he says he was employed by the Long-Bell Lumber Company and was not examined then, because Dr. Conicker, who had examined him, was the doctor for that company. He remained in the service of that company until September 5, 1930, when he was hurt. He brought suit against that company, and testifies that on the trial he was examined by Drs. Word, Stevens, and Reid. There is nothing in the record to indicate that plaintiff was suffering with a hernia at the time he underwent those examinations. He further testifies that about January, 1930, he was examined by Dr. Brown Ford with a view of taking insurance in the New York Life Insurance Company. He says he was examined for hernia by Dr. Word, and, as he expresses it, "from my feet to the back of my head."

Dr. Word testifies that about June, 1930, he examined plaintiff for the New York Life Insurance Company and for hernia, as that question was asked by that company, that the examination was thorough, and that plaintiff had no hernia. He testifies that he again examined plaintiff for an insurance company of Alexandria for the suit against the Grand White Lumber Company, which was about November, 1930, and that plaintiff had no hernia. Dr. Word said he examined plaintiff during the trial of this case and found he was suffering with left inguinal hernia. As plaintiff testifies he had been examined from his "feet to the back of his head," there can be no doubt the examination was thorough, as was said by Dr. Word.

Dr. Word, being recalled by counsel for defendant, was put to a rigid examination in reference to the examination he had given plaintiff. He was asked by the attorney if he had been specifically requested by the New York Life Insurance Company to make an examination for hernia. The doctor answered this question by saying that the application blank asked, "Has the applicant rupture?" and that he did not know how he could determine that without such an examination. He was asked by the attorney how long it took him to make the examination, to which he replied, forty-five or fifty minutes.

Counsel for defendant refers to the usual examination given to an applicant for an insurance policy. He says that ordinarily the physician takes your blood pressure, tests your pulse, and makes a very cursory examination.

Here we have the testimony of Dr. Word, who says he made a thorough examination of the plaintiff which lasted forty-five or fifty minutes. In addition, we have the evidence of plaintiff, who testifies he was examined from head to foot, which indicates that the examination was not perfunctory. There is therefore no ground to support the statement of counsel that the examination was cursory or superficial. To hold that statement as being correct, we would have to disregard the testimony of Dr. Word in its essential particulars and say that his testimony is not true. There is no proof in this record to indicate that Dr. Word could have had any ulterior motive arising from interest, relationship, or friendship to testify falsely to favor the cause of the plaintiff. There can be no doubt that he made a careful examination, and found after the examination that plaintiff had no hernia.

His examinations were also attacked by counsel for defendant from another angle by which he attempted to show that plaintiff was suffering from a reducible hernia and that during the examinations he could have voluntarily pushed the hernia back and concealed it. In that way it is contended that a physician can be deceived in making an examination of this character.

Dr. Frazar, defendant's expert on this subject, was questioned, as follows, by attorney for defendant:

"Please state how he can do that?

"A. Draw his breath in and hold it."

This plaintiff, Dr. Word says, was given an examination which lasted forty-five or fifty minutes; concealment of a hernia for that period of time by drawing and holding one's breath would simply be impossible.

It is shown besides by two or three of the physicians that a patient could not successfully conceal a hernia from the observation of a physician who made a careful examination, especially when he makes it with a view of ascertaining if he is afflicted with such a trouble, which Dr. Word testifies was the purpose he had in view when he examined the plaintiff.

As the proof shows that plaintiff had no hernia in June, 1930, and later in November, 1930, as appears by the examination of Dr. Word, this brings us to the consideration of Dr. Holcombe's testimony, defendant's witness, who examined plaintiff in December, 1931, and who says that plaintiff was then suffering with a hernia which was several years old, as is shown by his answer "Yes" to the following question, quoting: "Even would you say two or three, five, eight or ten years?"

Dr. Love agreed with Dr. Holcombe that the hernia was old; two of the experts of defendant said that the medical experts were divided in opinion on that subject, while the two experts for plaintiff gave as their opinion that its age could not be determined.

Hence, according to the testimony of Dr. Holcombe, the hernia with which plaintiff was suffering in December, 1931, was from two to eight or ten years old.

The actual examination of Dr. Word, as late as November, 1930, shows that plaintiff was then free of hernia. As this examination was made a little over eleven months before Dr. Holcombe examined plaintiff, Dr. Holcombe must have been in error in his computation that the hernia was two, three, eight, or ten years old.

We hold that the actual examination of plaintiff by Dr. Word must prevail over the opinion of Dr. Holcombe that the plaintiff was suffering with a hernia several years old in December, 1931, and which according thereto would have existed at the time Dr. Word made his examination showing that he was then entirely free from that trouble.

The opinion of Drs. Holcombe and Love that the hernia was old when plaintiff was injured is not to be taken as evidence in this case, as against that of Dr. Word, supported as it is by the testimony of the plaintiff, who says he never suffered with such an affliction prior to the time of the alleged accident.

It is shown by the evidence that, while plaintiff was riding in a truck with Perkins on his way for an examination by Dr. Douglas, a barrel weighing 100 or 150 pounds fell from the truck; that plaintiff got down and placed it back in the truck, unassisted.

After referring to this incident, counsel for defendant asked Dr. Word would he say that plaintiff had or had not sustained a hernia a few hours before. Dr. Word replied, "I would say he was not suffering very much." Dr. Frazar said, in answer to the same question, that he did not think if plaintiff had suffered a traumatic hernia he could have picked up the barrel a couple of hours after the accident and placed it in the truck. Dr. Love said, in reference thereto, that plaintiff could, "if he was strong enough." On being cross-examined on this statement, he replied, as follows: "I don't believe he would be inclined to do it. That is my opinion."

There is no testimony in this record to show that by such an accident plaintiff would have been so exhausted or weakened that he could not have picked up that barrel and have placed it in that truck. The testimony of the medical experts on this proposition is that, due to the pain resulting from such an injury, they do not think that plaintiff would have undertaken to perform such a feat; that he would not have been so inclined.

It may be that plaintiff was rash in lifting the barrel and that it was rather unusual for a man to be so inclined after suffering such an injury. Must we say, however, because of that act, that the hernia was old at that time in spite of the evidence of Dr. Word showing from actual examination that the hernia could not have preceded November, 1930, and could not have been old as testified to by Drs. Holcombe and Love?

Counsel for defendant also refers to the testimony of Perkins with whom plaintiff rode on the truck, where that witness says plaintiff, during the ride, did not complain of any injury or that he had been hurt.

When plaintiff dumped the log which he says caused the hernia, he immediately complained, saying he had been hurt. If this statement was false and the real fact was that he had an old trouble, it is evident that his purpose at that time was to frame up a claim against defendant on the pretense that the hernia was caused by the alleged accident. If such a scheme was so cunningly devised by him, at that time, he would not have suddenly lost his cunning when he got in the truck with Perkins for the trip to Dr. Douglas' office. On the way he would have spoken of his injury, would have complained so that he might have had additional evidence to sustain his claim, that his injury was recent. The fact that he did not complain indicates that he had no such purpose in mind. He did not really know, at that time, that he had a hernia, as he got that information from Dr. Douglas after he was examined, as the record shows. Not knowing he was so afflicted, while in the truck, he committed possibly a rash act in lifting the barrel, an act, however, which cannot be taken as proof destroying his testimony that he had never had a hernia before that accident, supported as that statement is by the evidence of Dr. Word, which shows that his hernia must have been of recent origin, and that it did not exist for several years and long before the alleged accident, the ground on which the defense rests.

We find that plaintiff has successfully carried the burden of proof by showing that the hernia was the result of the accident which occurred October 29, 1931, as by him alleged.

He claims that he was totally disabled and permanently. The evidence shows that, afflicted as he is, if he tried to do heavy work in which he was formerly engaged, strangulation of the hernia might result. The fact is, however, that his claim is not opposed on these grounds, but only because, as contended by defendant, he suffered no hernia while in the service of the Couch Construction Company.

He is claiming wages at 20 cents per hour or $2.40 a day, based on a day's work of eleven hours and a half.

The preponderance of the evidence shows that plaintiff's wage was 15 cents per hour, and we think that a ten-hour day is a proper basis to figure the amount he is entitled to recover.

He is asking for judgment for 65 per cent. of his wages for a period not exceeding 400 weeks.

Sixty-five per cent. on his daily wage of $1.50 entitles him to a weekly wage of $5.85 for a period not exceeding 400 weeks and for which we will enter judgment in his favor with legal interest from October 29, 1931.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be avoided, annulled and reversed; and it is further ordered and decreed that plaintiff have judgment against defendant, the Union Indemnity Company, for 65 per cent. of his daily wage of $1.50 per day, totaling $5.85 per week, for the period of plaintiff's disability, not to exceed 400 weeks, with 5 per cent. per annum interest from October 29, 1931, until paid, and that defendant company pay all costs of this suit.